1    know of.

2        Q.    Did Mr. Taylor's arrest stop All American

3    from selling its advertising?

4        A.    It stopped me from doing anything.  I was

5    extremely upset.  Being that I was the girlfriend of

6    a musician, you're used to girls in bars always being

7    drunk, throwing themselves -- it's kind of hard to

8    take, you know, and to add insult to injury that you

9    would see a complaint that my now husband would stop

10   in the middle of all that we were going through -- it

11   was terrible for our family, all of us -- and

12   possibly proposition a prostitute, to me, was beyond

13   sick.  There was a lot of stress in our home because

14   of his mother dying.  There was -- being on her death

15   bed, because of family being there -- it was a small

16   house.  We were trying to still make money and I was

17   still trying to work -- I was still working.  I just

18   pretty much just couldn't take it anymore.  It was

19   just too much stress.  That was just the end of it

20   for me at the time at that moment.

21       Q.    That's why you left for a few weeks?

22       A.    Yes, it is.

23       Q.    So did you not work during those few

24   weeks?

25       A.    No, I did not.

1    Q.    When you came back, did you start to work

2    again?

3    A.    Yes, I did.

4    Q.    So more or less it was during that period

5    of time when you moved out of the house that All

6    American for a few weeks stopped selling or trying to

7    sell?

8    A.    I'll be honest, I never really -- it took

9    awhile because still -- you know, even in the back of

10    my head at that time was, you know, this is a police

11    officer that said this, you know, and where I -- I

12    was raised in the country and we were raised to trust

13    the police.  I would never have believed that this

14    could be true.  To me, it was just unbelievable.  I

15    never had any -- at that point in my life had not had

16    any bad experiences with police officers.  I've

17    always had nothing but, you know, helpful -- you

18    know, whenever I got a ticket, it was because I

19    deserved it.  I never had bad experiences.  But I

20    guess being a woman and being the woman of a

21    musician -- and I've been hurt in the past, you know,

22    because of it.  It's hurtful to see that when he

23    plays music -- it bothered me, you know.  I mean,

24    because there's always that little tiny, tiny, tiny

25    thing in your head saying but a police officer wrote

```
 1    this.  And even though my better part of me -- the
 2    knowledgeable part, the person that knew him at that
 3    point for 15 or 16 years, it was in writing and it
 4    was on the Internet.  I was scared that people were
 5    going to find out about it.  I don't want my family
 6    to know about that.  I definitely did not.
 7         Q.  Do you understand why you're saying -- my
 8    question was, though, that once a few weeks passed,
 9    you got back into the swing of things and selling for
10    All American again?
11         A.  As best as I could, yes.  It wasn't a very
12    good year for us after that, no.
13         Q.  That's what I was asking before.  Do you
14    remember the revenues for All American for that year?
15         A.  Not a lot.  I want to say that year was
16    probably the 18,000 range.  I mean, it was low.  I'm
17    guessing here, but it was low because I really -- I
18    wasn't emotionally or mentally ready to do it, ready
19    to -- because this is the kind of business that you
20    have to be on all the time in order to be a good
21    salesperson.
22         Q.  But you would be guessing if I asked you
23    what the revenue was for 1999, right?  You don't know
24    what the revenue was for 1999?
25         A.  No, I don't.
```

```
 1        Q.   Or 1998?

 2        A.   No.

 3        Q.   Or 2001?

 4        A.   No, but I know that there was a lot of

 5   time in 2000 that I did not work.  I know that.  I

 6   did not work.  There would be days that I wouldn't

 7   want to do it; I know that.

 8        Q.   But isn't that true any year?  You don't

 9   work every single hour of every single day?

10        A.   I work every day except for Saturday and

11   Sunday and sometimes I work Saturdays.  By '02 I had

12   decided that I was going to go and work in an office

13   because I just lost interest in doing it all the time

14   at home, you know, after -- it just seemed like

15   things went downhill and I just -- by '02 I was

16   working in an office so --

17        Q.   So I thought you said before you worked

18   for somebody else in '03 and '04?

19        A.   I did.  That's what I'm saying, '02, '03.

20        Q.   You started in '02 for some other party?

21        A.   Yes.

22        Q.   Who was that?

23        A.   It was a company called Pro Ads.  I think

24   that stands for Pro Advertising.  I went to work for

25   them in like June of '02, I believe it was.
```

1      Q.    And you worked for them until about when?

2      A.    They went out of business in -- they went

3  out of business and I can't remember exactly when

4  they went out of business.  And then I went to work

5  for a company that was an off branch of them, so to

6  speak, where people that worked there started their

7  own business called BDA, Business Directory

8  Advertising.

9      Q.    How long did you work for them?

10      A.    Until '05.

11      Q.    And who do you work for now?

12      A.    I work for a company called DAS and I've

13  worked for them since BDA ended in '05.

14      Q.    And you get a 1099 from each one of these

15  employers?

16      A.    Yes, I do.

17      Q.    Are there any other 1099s that either Mr.

18  Taylor or you get?

19      A.    No, I don't think so.  No, not from -- we

20  only get it from the -- from our work -- from -- we

21  only get 1099s, of course, from the companies we work

22  for.  We're technically self-employed.

23      Q.    So you don't get a W2 then either --

24      A.    No.

25      Q.    -- because you're self-employed?

1        A.    Huh-uh.

2        Q.    And I'm sorry, who did you say Mr. Taylor

3    is working for now?

4        A.    He's working at the same company I do,

5    Directory Assistance Services, but sometimes he gets

6    called by other companies because he's became a very

7    good delivery guy, field rep, and sometimes he takes

8    freelance jobs from them here and there.

9        Q.    So is he doing better as time passes in

10   that line of work?  2006, was that better than 2005

11   and was that better than 2004 because he's getting

12   known in that area?

13       A.    I guess you could say in a way, but, you

14   know, there's a big difference between being your own

15   boss and being under someone else.  You know, it's

16   totally different when you're -- you're -- the only

17   person you answer to is your girlfriend or your wife,

18   you know what I'm saying, than to go to work for

19   somebody else.  But, yes, he does take other jobs,

20   other than the company we're working for.  He will

21   take a freelance job, if he can do it.  If it's

22   feasible for him to do the job and it's going to be

23   making money, you know, because his job is

24   percentage, so he gets commissions -- all commission

25   based.

© Ace-Merit, LLC   (513) 241-3200
30 Garfield Place, Suite 620   Cincinnati, Ohio 45202

```
 1              MR. GANULIN:  I don't think I have
 2         anything else, but Ms. Rutowski or Mr. Hardin
 3         might have some questions.
 4                    CROSS-EXAMINATION
 5    BY MS. RUTOWSKI:
 6         Q.    Just briefly going back to 2000, you said
 7    that a lot of Mr. Taylor's family was staying with
 8    you due to his mother's illness?
 9         A.    Yes.
10         Q.    Were you close with her?
11         A.    His mother?
12         Q.    His mother.
13         A.    His mother had a stroke and didn't speak
14    before I ever met him back in the '70s, okay, so she
15    was not a person that you really would have had a
16    relationship with.  She was ill.  She didn't talk or
17    anything like that.  So did I care for her?  Of
18    course.  But did we ever have a conversation?  No, we
19    did not.
20         Q.    When did she pass away?
21         A.    In 2000.  In 2000 March, 17th.
22         Q.    And you said that with all the people in
23    the house, you were trying to keep this whole
24    incident from them?
25         A.    Oh, yes.
```

```
 1         Q.    Were you able to do that?

 2         A.    Yes.

 3         Q.    You were determined?

 4         A.    Well, they just thought we had an

 5   argument.  You know, they -- basically, you know,

 6   they thought that we had a big argument and I left,

 7   you know, for a while.  So there was no way that I

 8   wanted them to know the real reason, no, and I

 9   certainly didn't want my kids -- at the time my

10   daughter was six or seven and there's no way I would

11   want -- I would have wanted that to happen.  She --

12   my daughter was older than that.  My son was six, so

13   my daughter would have been 12, close to 13, so there

14   was no way I would have wanted that to get down to my

15   kids.  I mean, it's very embarrassing.

16              MS. RUTOWSKI:  I don't have anything else.

17                   CROSS-EXAMINATION

18   BY MR. HARDIN:

19         Q.  I'm just a little confused and I need to

20   go back and --

21              MR. TAYLOR:  Who is this?

22              MR. GANULIN:  Mr. Hardin and Ms. Rutowski

23         represent the police union.

24              THE WITNESS:  Okay.  I'll try to clarify

25         anything.
```

44

```
 1            MR. GANULIN:  They're representing Police
 2        Officer Hart.
 3            MR. TAYLOR:  I was not introduced to them,
 4        so I don't know.
 5            MR. HARDIN:  I'm sorry.  I think I was in
 6        probably having surgery at the time of your
 7        deposition so I couldn't be here.
 8            MR. TAYLOR:  I see.
 9     BY MR. HARDIN:
10        Q.   When approximately did you start this
11     initial business?
12        A.   We did All American Marketing from '93 and
13     we made our living at it --
14        Q.   Okay.
15        A.   -- all the way up until I went to work
16     full-time at another company.
17        Q.   And that full-time work would have been in
18     2000 --
19        A.   I think 2002.
20        Q.   Okay.  So from '93 to 2002, your income
21     came from All American?
22        A.   Other than whatever he made music wise.
23        Q.   Okay.  And did you share the income --
24        A.   Well --
25        Q.   -- that came in?
```

```
 1          A.   There wasn't a lot to share, to be honest.
 2    Our business was at home, so after we paid expenses
 3    for living, you know, we had to pay the people to
 4    print the cover.  We had to pay the art person that
 5    laid it out.  We had to buy software, you know,
 6    because there's software that does the art.  We had
 7    to provide these things to the people who did the
 8    covers for us.  We bought copiers, computers,
 9    everything.  Basically what we made that we didn't
10    use for living went back into our business because we
11    did eventually want to have a company -- more people.
12          Q.   Did you ever register with the state of
13    Ohio or the secretary of Ohio -- secretary of
14    state --
15          A.   We had an employer --
16          Q.   -- for your business?
17          A.   -- ID number.  We had an EIN number and
18    all that, yes.
19          Q.   You had both of those, the employer ID and
20    the EIN number?
21          A.   We had the EIN.  That's what we had to
22    have.
23          Q.   And you filed federal tax returns?
24          A.   Yes.
25          Q.   And state tax returns?
```

```
 1        A.    Yes.
 2        Q.    And city tax returns?
 3        A.    As far as I know, yes.  I did everything I
 4    was supposed to do.
 5        Q.    And that would show the total income that
 6    the company received and then show what deductions
 7    you took from the total income --
 8        A.    Right.
 9        Q.    -- to come up with a net profit?
10        A.    Right.
11        Q.    You always had a profit, right?
12        A.    No, we did not always have a profit, you
13    know, because so much was written off.  You know,
14    part of it -- you know, part of where you live,
15    because we worked from home, and, you know, gas and
16    everything else that -- I mean, we were not making a
17    lot of money doing the business.  The business was
18    because I wanted to be home with my son from the time
19    that he was a baby so that I could not have to send
20    him to day care, so that I could be at home when my
21    daughter got home from school.  That was important to
22    me.  If I had wanted to make tons and tons of money,
23    I could go work in an office and just sell ads.
24        Q.    Right.  There's no way that you can tell
25    us today how much money your husband, Gradual Taylor,
```

1    made during those years '99 through 2002?

2        A.   No.  Not today, no.

3        Q.   Or '93 through 2002?

4        A.   No, there's not.  I'm being as truthful as

5    I can and trying to be as complete as I can.  You

6    know, our business at that time, because we had small

7    children, was so that I could be at home.  That was

8    my goal.  That was what I wanted to do.  And I always

9    knew that if I wanted to make really big money, which

10   I do now, you know, I could go work for a company and

11   do it.

12       Q.   Okay.  Your choice.  And you were the

13   person who really formulated the business and was

14   running the business, right?

15       A.   Well, without a sale, there is no

16   business.  That is just the way that it is in our

17   business.  It's not like, you know, he can go deliver

18   phone book covers that doesn't have ads sold on them.

19   You have to sell the ads.

20       Q.   I'm just curious in 2000, when this

21   incident occurred, he was supposed to be going to El

22   Paso --

23       A.   Yes, he was.

24       Q.   -- with a delivery?

25       A.   With two.

1    Q.   Two deliveries?

2    A.   Yes.

3    Q.   How much -- what's involved in a delivery?

4         MR. TAYLOR:  That's incorrect.

5         MR. HARDIN:  Wait a minute.  Just for the

6    record, you can't participate.

7         MR. TAYLOR:  I know that.  I don't know

8    what to do when something is going on that's

9    just wrong.

10   A.   As far as I know --

11        MR. GANULIN:  Let's just take -- go off

12   the record for one second.

13        (Off the record.)

14        MR. GANULIN:  We should go back on the

15   record now.

16 BY MR. HARDIN:

17   Q.   Just so that we get the record straight,

18 there was some discussion about the answer you just

19 gave to me before --

20   A.   Yes.

21   Q.   -- right?

22   A.   Yes.

23   Q.   And now you're going to explain that --

24   A.   Yes.

25   Q.   -- after you got some information from Mr.

1    Taylor?

2         A.    Okay.  I'm just not -- okay.  He had two

3    covers to do, okay -- two editions of the phone book

4    cover.  El Paso, at the time, had an A to L and an M

5    to Z phone book.  It was a big huge phone book.  So

6    you would do a cover for one phone book and one for

7    the other.  So on these covers is anywhere --

8    probably about 20 to 23, 24 deliveries per each one.

9    He had two sets -- we call them sets -- to do.

10   That's what we call them in our business, sets.  We

11   had a cover for A to L and a cover for M to Z.  And

12   the reason we did it that way was instead of going to

13   El Paso twice and having to pay gas twice and motels

14   twice and airline tickets twice, he could do both of

15   them at the exact same time and collect all of the --

16   anywhere between 40 to 45 ads that were on that

17   cover.

18        Q.    Okay.  Now, what I was trying to get to

19   here is back in 2000 again, on the El Paso trip,

20   there are two covers.  They each have 20-some ads on

21   them?

22        A.    Right.

23        Q.    How many copies go to each one of the

24   people who bought an ad -- how many copies of the

25   cover?

50

```
 1          A.   Let me explain to you briefly how our
 2     cover works.  People don't buy phone book covers.
 3     They buy ads on them.  We get a distributor in that
 4     area.  I happen to know this because I used them for
 5     many years.  It is the El Paso Association of
 6     Realtors.  They're a huge conglomeration.  We give
 7     the association the covers to get out and we sell the
 8     spaces on the cover to business advertisers because
 9     they want to go to that market.  They want to
10     reach -- a home inspector would potentially want to
11     reach somebody buying a house or a mortgage broker
12     buying it.  That's how I sell it.  I sell them the
13     ads and I tell them it's being given out by the Board
14     of Realtors.
15          Q.   How do the telephone covers get from
16     Cincinnati --
17          A.   Uh-huh.
18          Q.   -- to El Paso?
19          A.   In this instance it was because Mr. Taylor
20     would have picked them up from the printer and took
21     them with him.
22          Q.   How many covers are we talking about?
23          A.   About 2,000 covers.
24          Q.   2,000 covers?
25          A.   Uh-huh.
```

1        Q.    And he would take them to the Board of

2    Realtors?

3        A.    He would take all but maybe a couple of

4    hundred --

5        Q.    Okay.

6        A.    -- to the Board of Realtors and the couple

7    of hundred that he kept, he would give copies to the

8    people who bought ads on the covers.

9        Q.    To the businesses he's collecting from?

10       A.    Correct.

11       Q.    How much would an ad cost on the cover,

12   approximately?

13       A.    Generally, at that time -- I've kind of

14   raised the prices since -- anywhere between $199 to

15   $300.  Usually between 2- to $300, roughly.

16       Q.    So what would an average bill to an

17   average advertiser -- I bought one ad on your

18   cover -- a small ad because you can't get a big ad --

19   too many of those on a telephone book cover --

20       A.    Right.

21       Q.    -- how much would that cost me for the ad?

22       A.    I would say around $250 or $300.

23       Q.    So he would be picking up 250- or $300

24   from approximately 50 people -- 50 different

25   companies?

1      A.    About 40.  Usually I would put about 20

2   ads on a cover.  Sometimes it's a little less;

3   sometimes it's a little more depending on somebody

4   might buy a double ad.  In our business we do the

5   work here first and then we bring it out.  You often

6   get people who don't want to pay.

7      Q.    If you can slow down just a little bit.  I

8   know enough about court reporting that if you go too

9   fast, it's really hard to get it.

10      A.    I'm sorry.  Well, roughly about 20

11   companies on a cover and out of that 20 generally

12   maybe three might not pay you because we do a

13   business where they make sure it's correct, they make

14   sure they're the only business of their type on this

15   cover and then every now you just get someone who

16   flat out isn't going to pay you.

17      Q.    Do you ever send bills to these companies

18   and just have them pay you by mail?

19      A.    No.

20      Q.    Why not?

21      A.    Because that is how we sell it.  It is

22   sold that when the cover is done, you make sure it's

23   correct, that you're exclusive and that's when we

24   accept payment on it, so that's not how it was sold.

25      Q.    So you don't send them a proof and say is

1    this okay?

2        A.    No.   They pretty much know what their ad

3    looks like because it's going to be like their Yellow

4    Page ads most of the time.

5        Q.    And most of the time the people pay when

6    the --

7        A.    Yes.

8        Q.    -- covers are delivered?

9        A.    Yes, they do.

10       Q.    But you never made an attempt to try to

11   collect the amount of the contract just by sending

12   out an invoice?

13       A.    No.   In our business it would not work

14   that way because it's not sold that way.

15       Q.    Okay.   I've just -- if my company buys

16   Christmas cards imprinted, the company sends me a

17   bill for the imprinted Christmas cards.   They don't

18   deliver them --

19       A.    I see, but that's how they sold it to you,

20   sir.   If I sold you that suit that you're wearing

21   right now and I said to you after it's tailored,

22   after it's perfectly done for you, that's when you

23   pay for it, you would not pay me until it fit you and

24   it was tailored to you.

25       Q.    But that was your business decision to

1    sell it that way?

2        A.    That's how I was taught to sell so I don't

3    know any other way.

4        Q.    All right.  Now, with regard to the tax

5    returns, you know that as the person who files a tax

6    return you can get a copy of your tax return; is that

7    right?

8        A.    Yes, I do.

9        Q.    Okay.  So if we requested copies of tax

10   returns, you would be able to obtain them from IRS or

11   the state or the city; is that correct?

12       A.    I would think so.  I mean, it's been --

13   like I said, these are seven years ago.

14       Q.    I understand, but it becomes important.

15   It's part of the documentation --

16       A.    I understand.

17       Q.    -- of the case here.  So would you be

18   willing then to take the necessary steps to get those

19   copies?

20       A.    I'll try.  I mean, I really don't even

21   know what those steps are at this point it's been so

22   long.

23       Q.    If we made it easy for you to do that and

24   gave you the instructions, could you -- would you do

25   those?

1          A.    I guess so.  I don't see --

2          Q.    Now, you say you have some tax returns at

3    home probably, at least the last couple of years,

4    2005, 2004?

5          A.    Right.

6          Q.    Maybe 2003?

7          A.    Right, but these are from where we worked

8    for other companies.  You know, they're not from All

9    American Marketing.

10         Q.    I understand that.  I understand that.

11   You have no tax returns from All American?

12         A.    Not for a while, no.  I mean, my son is

13   now 12 and, you know, as I said, the whole goal in

14   the beginning back in '93 and '94 was so that I could

15   have a baby and be -- I knew he was going to be my

16   last child.

17         Q.    I understand that.  I'm just asking you

18   for documentation --

19         A.    Right.

20         Q.    -- which was the purpose of this

21   deposition.

22         A.    Right.

23         Q.    And I'd have to suggest to you if you do

24   have documents, they are only in the form of tax

25   returns, right?

```
 1        A.    Right.
 2        Q.    You don't have copies of any 1099s?
 3        A.    Yeah.  I have some 1099s from other
 4   companies I worked for, yes.
 5        Q.    And there are no documents at all
 6   regarding Mr. Taylor's income from the musical
 7   performances he makes, right?
 8        A.    No.
 9        Q.    He never -- how did he get his jobs?
10        A.    He had a booking agent that would book him
11   jobs.  He was very popular here.
12        Q.    Did he have to -- did he have to pay the
13   booking agent?
14        A.    The booking agent basically -- I don't
15   know how that worked.  I really didn't -- I don't
16   know how it worked.  He had a booking agent.  That's
17   all I know.
18        Q.    You have no idea how much income ever came
19   in as far as his musical performances?
20        A.    Well, it wasn't like he hid it from me or
21   something.  I mean, it was just I really wasn't
22   interested in it.  It wasn't what was going to pay
23   the rent, okay, so I really wasn't -- other than, you
24   know, whatever -- it just wasn't something I was that
25   interested in.  I did not like that.  I did not like
```

```
1    the music business.
2         Q.   So would I be correct in assuming that
3    from '93 through today's date that Mr. Taylor's
4    income would be derived from his musical performances
5    and whatever income he got from either All American
6    or these other companies that he works for?
7         A.   Okay.  I don't understand the question.  I
8    guess I have a question.  Are you asking me --
9    because he hasn't played music in a long time.
10        Q.   Right.
11        A.   All his income has been from delivery jobs
12   for phone book covers.
13        Q.   Okay.  So whatever income there was within
14   the last eight years would probably come from
15   delivering the covers?
16        A.   I can't remember exactly when he stopped
17   playing music constantly.  I don't remember exactly
18   when that was, but I can say definitively in the last
19   few years it's been nothing but -- the income that he
20   has brought into the home has been from delivering
21   phone book covers.
22        Q.   I would like to continue this deposition
23   in progress until you have an opportunity to review
24   and get whatever records you can -- financial records
25   for the income for All American or your joint
```

```
 1    income --
 2         A.    Right.
 3         Q.    -- that you filed your income tax returns
 4    from.
 5         A.    I see.
 6         Q.    And then we'll have to reconvene it again
 7    once you are able to obtain those records.  And what
 8    we're looking for are tax records starting in '93 all
 9    the way through 2005.
10         A.    Well, I easily have the last three.  I do
11    not have the years prior to that anymore.  It's been
12    a very long time and I don't have them.  I don't even
13    think you're required by law to keep them after so
14    long.  I know that I do have 5s and 4s, possibly 3s,
15    but before that I can't guarantee.  And I know I
16    don't have --
17         Q.    Right.  Well, whatever you have, you'll be
18    able to produce and that would include 1099 forms --
19         A.    Sure.
20         Q.    -- for you and Mr. Taylor?
21         A.    Sure.
22         Q.    Not just you?
23         A.    Whatever I have, I can bring in.  I'm not
24    saying that I have all of them and I know I don't
25    have any of the '90s, not anymore.
```

```
 1        Q.    Then what we don't have that you can bring
 2   in, we can then talk about getting copies of through
 3   sending request forms through the taxing agencies?
 4        A.    Okay.
 5              MR. HARDIN:  With the understanding that
 6         this is continued in progress, I don't have any
 7         further questions.
 8              MR. GANULIN:  Mr. Taylor, do you have any
 9         questions?
10              MR. TAYLOR:  Well, I would first just like
11         to say --
12              MR. GANULIN:  You can ask questions of
13         your wife.  If not, we can go off the record.
14              MR. TAYLOR:  I really don't know what to
15         say because I'd like to apologize if I've
16         gotten out of line because this time yesterday
17         I was in Tampa, Florida, so I'm not really on
18         my game right now, and I drove.
19              So one thing that I'm -- I can be sure
20         that none of you are musicians and the thing
21         is -- I know you make the jokes about the
22         musician, where we make the lawyer jokes.  I
23         won't do that, but I'll say when you are asked
24         to perform in public or speak in public you
25         don't want to have that little saying in the
```

1    back of your head about where somebody's going

2    to come out of the crowd and say, hey, you were

3    arrested for being with a prostitute.  That's

4    like the worst nightmare that you could ever

5    imagine.  I don't have the guts to do that.

6    Maybe you do; I don't.  One of the things that

7    makes me admire Clinton because he can still

8    keep going.

9        Let's see.  My wife is not -- we didn't

10   really discuss this because I knew she'd do a

11   very good job, but one thing that she was not

12   real clear on is that's when the music stopped.

13   I never really told her -- I never really made

14   it clear to her that's why I'm not taking jobs

15   because I don't want to go out and face this,

16   but because maybe none of you put yourself in

17   that position of coming out on stage and, hey,

18   it's a wonderful day and by the way, I beat the

19   prostitution rap, you know.  Okay.  I know I'm

20   not doing a very good job now.  I'm half

21   asleep.

22       MR. HARDIN:  Let me just suggest to you,

23   Mr. Taylor, what we're doing is taking a

24   deposition of your wife.  You'll have an

25   opportunity to present your case when we go to

```
 1        trial.  And I understand what you're saying,
 2        but basically having -- I think your wife
 3        expressed it:  it's not unusual for musicians
 4        to have girls throwing themselves at you and if
 5        you read the tabloids or look at the
 6        newspapers, it goes on all the time with rock
 7        stars and everything and it's almost a badge of
 8        courage, so --
 9            THE WITNESS:  Not getting a hooker.
10        There's a difference between a groupie and a
11        hooker.
12            MR. HARDIN:  Okay.
13            THE WITNESS:  There's a huge difference.
14            MR. HARDIN:  I'm not going to argue the
15        point right now, but I just want to say to you
16        that this is not the time for us to get into
17        that.
18            THE WITNESS:  Right.
19            MR. HARDIN:  All we're trying to do right
20        now is you've been identified as the person who
21        has the key to all the financial records and --
22            THE WITNESS:  I'm going to give you what I
23        can.
24            MR. HARDIN:  -- and we haven't unlocked
25        all the locks yet.
```

```
 1            THE WITNESS:  Right, I understand.  I
 2       think what I'm -- what I wanted to be clear
 3       about, though, is you are right when you are --
 4       I do mean to say that when you're a musician,
 5       there's always girls.  Everywhere you go
 6       there's women.
 7            MR. TAYLOR:  Oh, boy, it sounds like the
 8       inquisition.
 9            THE WITNESS:  It's quite different for him
10       to go seek those women.  That was the
11       difference.
12            MR. HARDIN:  I worked in the entertainment
13       business for a while, so I know a little bit
14       about it.
15            MR. TAYLOR:  You did?
16            MR. HARDIN:  Yeah.
17            MR. TAYLOR:  Really?
18            MR. HARDIN:  So anyway, I just want you to
19       know that we will be contacting you again.
20            THE WITNESS:  Sure.
21            MR. HARDIN:  And if you -- if you would,
22       if you find those records and get all the
23       records you can find, I think if you call
24       Mr. Ganulin, you know his number and
25       everything --
```

THE WITNESS:  Right.

MR. HARDIN:  -- and then we can set up the deposition through his office.  Thank you.

THE WITNESS:  Thank you.


_____
SHEILA TAYLOR


-  -  -

DEPOSITION CONCLUDED AT 2:53 P.M.

-  -  -

```
1                    C E R T I F I C A T E
2      STATE OF OHIO        :
                            :        SS
3      COUNTY OF WARREN     :

4            I, Kimberly L. Wilson, CSR, the undersigned, a
5      duly qualified and commissioned notary public within
6      and for the State of Ohio, do hereby certify that
7      before the giving of her aforesaid deposition, SHEILA
8      TAYLOR was by me first duly sworn to depose the
9      truth, the whole truth and nothing but the truth;
10     that the foregoing is the deposition given at said
11     time and place by SHEILA TAYLOR; that said deposition
12     was taken in all respects pursuant to stipulations of
13     counsel; that I am neither a relative of nor employee
14     of any of the parties or their counsel, and have no
15     interest whatever in the result of the action; that I
16     am not, nor is the court reporting firm with which I
17     am affiliated, under a contract as defined in Civil
18     Rule 28(D).
19           IN WITNESS WHEREOF, I hereunto set my hand and
20     official seal of office at Lebanon, Ohio, this   5
21     day of     February          ,  2007.
22
23                              Kimberly L. Wilson
24     My commission expires:    Kimberly L. Wilson, CSR
       June 15, 2009.            Notary Public - State of Ohio
25
```

© Ace-Merit, LLC  (513) 241-3200
30 Garfield Place, Suite 620  Cincinnati, Ohio  45202