```
 1    haywire or you were driving around trying to figure
 2    out how to make it work.
 3              A.    Right.
 4              Q.    And describe the manner of your driv-
 5    ing.  The streets there go in all different direc-
 6    tions, don't they?
 7              A.    Right, uh-huh.
 8              Q.    You have to say yes for him.
 9              A.    Yes.  Okay.  I'm sorry.  I don't do
10    this every day, thank god.
11              Q.    The streets, they hit each other at
12    awkward angles --
13              A.    Uh-huh.
14              Q.    -- if I know.  Is that right?
15              A.    I'm going to say yes, because if I
16    think about how I would have driven around there, now
17    to think about it, I can't really even tell you.  And
18    you know what?  When I'm doing my job, my business, I
19    drive around all haywire, too, you know, because --
20    okay.
21              Q.    Okay.  But on that day, though, you
22    didn't just drive 60 yards away and stop.  You were
23    driving around up and down these little streets to
24    try to get your system to work.  Isn't that correct?
25              A.    I don't think it was exactly the way
```

```
1    you're saying it.  But, I mean, if I said yes --
2           Q.   I'm not trying to put words in your
3    mouth, so why don't you describe how you drove in
4    that neighborhood.
5           A.   If I -- if I can -- the way I'd have
6    to say is, I drove to be safe and I drove to watch
7    what the GPS is telling me and tried to remember what
8    it's telling me versus what I know or I have a good
9    idea is right, because I would soon be in an area
10   where I didn't know if it was right, and I needed to
11   know what it was saying to me.
12          Q.   In the course of driving around the
13   Mohawk area --
14          A.   Yes.
15          Q.   -- how many times do you think you --
16          A.   I must say this.
17          Q.   Go ahead.  Finish your --
18          A.   Okay.  I must say one more thing.  The
19   Mohawk area is not the only area that I drive around
20   in.
21          Q.   We're talking about just at the time
22   in question --
23          A.   Yes.  I know.
24          Q.   -- for this.
25          A.   I know, but it just -- I do the same
```

```
1    thing different areas of time, different -- oh, jeez.
2    I'm not getting my words right here.
3                I do this in different areas, differ-
4    ent times, different nights, times of night, differ-
5    ent weather conditions, and I need to know this.  I
6    need to know these things.
7         Q.    Okay.  In driving around on the day
8    and time in question --
9         A.    Yes.
10        Q.    -- how many times did you pass right
11   in the vicinity of where Officer Hart was standing?
12        A.    I would have to say probably two or
13   three times.  But the first time that I saw her --
14               Okay.  I'm trying to get my words
15   together here.
16               -- it was not -- I'm losing that
17   thought, you know.  I'm sorry.
18        Q.    But, anyway, you passed by her a few
19   times?
20        A.    Yeah, yeah.  It was not like -- it was
21   not like it had anything to do with her.  It was
22   more -- that was more -- I don't want to say coinci-
23   dence, but I just want to say it was a legal place to
24   park and I could stop and think about what was going
25   on where I was.
```

1          Q.    Okay.

2          A.    Okay.

3          Q.    And given what you said before -- now

4    we'll get on to what you wanted to talk about before.

5    Given what you were saying about discovering that you

6    were in the middle of a prostitution sting and so

7    forth, can you understand how Officer Hart on the

8    sidewalk there as the active officer presenting

9    herself as a prostitute could perceive a car going in

10   the vicinity of her a few times might be what they

11   call a john?

12         A.    Well, she might do that.  But the

13   thing is, when a -- when you go up to a person and

14   you say, "Are you looking for this, this, this and

15   this," and the person says, "No.  I'm just driving

16   around," as I did, then I wouldn't think she would

17   think that anymore.

18         Q.    Even when the person keeps driving

19   around?

20         A.    No, no.  There was just a few -- when

21   you say it like a person keeps driving around, it

22   wasn't that way.  But, I mean, it was more --

23         Q.    Well, I'm not trying to exaggerate

24   what you said.

25         A.    Okay.

```
 1              Q.   But the point is, you passed in the
 2    vicinity of her --
 3              A.   Right.
 4              Q.   -- a few times?
 5              A.   Right.  And a lot of people passed in
 6    the vicinity of her a lot.
 7              Q.   But not necessarily the same person?
 8              A.   The same person?  Oh, you know --
 9              Q.   Different cars passed?
10              A.   Yes, right.
11              Q.   But not the same car repeatedly?
12              A.   When you say repeatedly, that doesn't
13    really --
14              Q.   Again, I'm not trying to exaggerate.
15              A.   Okay.
16              Q.   I mean, the few times as you were
17    driving around that you passed in the vicinity of
18    her, that's different than when you're suggesting
19    different cars are going by?
20              A.   I don't -- you know, I've kind of lost
21    the meaning of what you're saying there.  I'm
22    sorry --
23              Q.   Okay.
24              A.   -- about that.
25              Q.   My question is, do you understand that
```

© Ace-Merit, LLC   (513) 241-3200
30 Garfield Place, Suite 620   Cincinnati, Ohio  45202

1    an officer performing the job Officer Hart was on the

2    day in question who sees a vehicle passing in the

3    vicinity a few times could perceive that --

4                A.    Not unless --

5                Q.    -- driver as a so-called john?

6                A.    Not unless the person did the things

7    that would legally -- that a john would do, would say

8    the things that a john would say, not -- or would act

9    in the way that a john would act.

10                      And the second time that I saw her she

11   came up, and I was clearly working with the GPS.

12   Maybe she didn't know what it was, maybe she did know

13   what it was, but it had nothing to do with her.

14                Q.    What would you think a john says in

15   that situation?

16                A.    What would he say?  He'd probably say

17   what he wanted.

18                Q.    And what does he do?  You talked about

19   what a john says and does.

20                A.    Well, I mean, those would be the

21   things that you could -- let's see.  He certainly

22   wouldn't say "I'm driving around."  He certainly

23   wouldn't say "I'm working with a GPS unit."  He'd

24   say, you know, whatever you want.  Your guess.  I

25   want a this, I want a that, you know.

1          Q.   And have you ever done that yourself?

2          A.   No.

3          Q.   How old are you now?

4          A.   Well, I'm 57 now.

5          Q.   And so this occurred in the year 2000?

6          A.   I believe so.

7          Q.   Do you recall what income you reported

8 on your income tax forms for the years prior to 2000?

9 More or less. I don't need to know exact.

10         A.   Do I recall it?

11         Q.   Right.  Your income for the year 1998.

12         A.   I don't recall.

13         Q.   '99?

14         A.   I don't -- you know, those are --

15 either we hire people to do that or -- when I can

16 afford it, or that, but that's all I can say.

17         Q.   How about 2000?

18         A.   What are you asking me, the amount?

19         Q.   I'm asking you your personal income

20 for the years prior to the year 2000 and the year

21 2000.

22         A.   I would not be very good about that.

23 You know, I have to say I'm very advanced in some

24 ways and in some ways I'm not, and that's one of the

25 areas that I'm not.

1    Q.   Give or take $5,000, do you know what
2    your income was for those years?
3         A.   I don't know.  But I'll tell you this.
4    We were -- I actually had two jobs.  I was an enter-
5    tainer and I'm in this advertising field.  Both of
6    those were building, and both of those businesses,
7    it's like you cannot take time off from them, you
8    know.  You're either working or you're dead.
9         Q.   What was the name of the business?
10   You're talking about the plastic telephone cover
11   business?
12        A.   Yes, uh-huh.
13        Q.   What was the name of that?
14        A.   All American Marketing.
15        Q.   And who started that?
16        A.   I did.
17        Q.   When?
18        A.   I would say '92.
19        Q.   1992.  And did you have an accountant
20   for the business?
21        A.   Yes.
22        Q.   Who was that?
23        A.   Oh, let me see.  Who would that be?  I
24   think we used H and R Block for a degree.
25        Q.   Do you still have the records from

```
 1   that business?
 2           A.   I don't know.  I am very bad about
 3   that, but I --
 4           Q.   Do you remember the sales of the busi-
 5   ness, more or less?
 6           A.   The sales of it.  What do you mean?
 7           Q.   The sales revenue.
 8           A.   I can't tell you.  I'm not very good
 9   about it.  But I will tell you this.  It was the type
10   of thing where we started on a shoestring budget, as
11   a lot of businesses do, and as we could afford it, we
12   would buy computers, we would buy printers, we would
13   buy more computers.  We'd buy things for the busi-
14   ness.  And there were a lot of deductions from that
15   because --
16                And at that time we spent a lot of
17   money on long distance calls.  Long distance at that
18   time was tremendously -- it was way more expensive
19   then than it is now and --
20           Q.   So did the business have a net income
21   in 1992 or a net loss?
22           A.   I don't know.
23           Q.   How about '93?
24           A.   I don't know.  I can't -- I can't
25   really say.  I'd have to talk to my then girlfriend
```

```
 1    and now wife, who just went to pieces over this whole
 2    deal.
 3              Q.   Does she possess the records from the
 4    business?
 5              A.   I don't know.  Like I say, that's an
 6    area I'm very bad at, but --
 7              Q.   So you don't have any idea of what the
 8    revenues were or the net income or anything for the
 9    business from the time it started in 1992 on?
10              A.   I basically do not.
11              Q.   Do you still have that business?
12              A.   Yeah.  It's kind of floun-- I mean,
13    it's kind of floundering now, because, I mean, every
14    now and then we'll revive it.  It's basically in name
15    only now.  At that point I was doing that and my
16    entertainment group.
17              Q.   And when you say at that point, which
18    point do you mean?  At the time of this --
19              A.   Yes, yes.
20              Q.   -- occurrence here that's the subject
21    lawsuit?
22              A.   At that point -- I mean, it's so hard
23    to tell little pieces of the way this all came
24    together and all went down, but the best that I can
25    think to do it is straight through tell how it
```

```
 1    happened, and then there are things that need to be
 2    said about how this happened and why this happened
 3    and things.
 4              And you're kind of throwing me off a
 5    little bit by jumping to different places, but I'm
 6    doing the best I can.  I hope you feel like I'm doing
 7    the best that I can, because I am.
 8              Q.   So during the years prior to 2000,
 9    although you don't know the amounts, you received
10    personal income from --
11              A.   Yes.
12              Q.   -- this business?
13              A.   Yes.  However, I also have to tell you
14    that -- and this is what makes these things a little
15    hard to tell; I mean to say in words -- is that when
16    that happened, as I told you, very shortly I had two
17    funerals.  And I had to pay for both of them, so --
18              Q.   Is that in the year 2000?
19              A.   After a year, slightly after,
20    slightly -- like my mother may have lived another --
21    well, let's see now.  That week I went to -- probably
22    that week I went to El Paso and she died, so --
23              Q.   And it cost a lot of money, is that
24    what you're saying, for the two funerals?
25              A.   Yes.  And that really shook up every-
```

1    thing, plus the fact that, see, some of -- the way --

2    okay.  You got me jumping all over again.

3              Q.    That's all right.

4              A.    I'm trying to talk -- the way the

5    people -- my girlfriend at the time, and now wife,

6    the way the police officer said it to her when --

7              She knew that I had to have that cell

8    phone for my mother, so --

9              My god, I jumped in from another spot.

10   But I'll just do the best I can.

11             Q.    Well, let's finish with you incurred

12   the large expenses.

13             A.    Yes.

14             Q.    And that affected things?

15             A.    Well, a whole bunch of things affected

16   things and it came into play.  And like I say, my

17   relatives are in town.  I mean my aunts, my sisters

18   from California, are all at my house.  My mother's

19   dying.  I've got a cell phone to talk to the doctors.

20   But they separated me from the cell phone and they --

21   fortunately, as I recall, nothing happened between

22   the time that I was in and the time I got out.

23             The other thing, when I got out of

24   jail I was thinking to myself:  Now, wait a minute.

25   They took my keys.  What did they do with my car?  So

```
 1      I went back to my car, and it was open in the Mohawk
 2      area of Cincinnati.  I don't know.  There's just so
 3      many things to talk about, but --
 4               Q.   Okay.  Let's get back.
 5               A.   You're helping me get it together,
 6      because I'm --
 7               Q.   That's fine.  We were talking about
 8      your business.
 9               A.   Okay.  Uh-huh.
10               Q.   And it sounds like there were some
11      financial difficulties that occurred as a result of
12      the deaths of your family members and the expendi-
13      tures for the funeral and --
14               A.   Well, that and the fact that my wife,
15      my girlfriend then, was like the lead -- she actually
16      ran the business.  She has a head for it; I don't.
17      And at that point your officers -- I don't want to
18      say your officers.  That's not fair.  But the people
19      that she had to go pay the fine to says -- over and
20      over, people she would talk to would say, "Oh, the
21      man arrested for prostitution?"  And that just drove
22      her crazy, you know.
23                    And so she actually --
24                    I think you've read this in my papers.
25      Right?
```

```
 1                  -- she bailed me out and sold things
 2       so she could move the kids and things away.  And
 3       that's pretty much, you know -- and like I say, this
 4       is like a thing where you have to keep --
 5              Q.    She was your girlfriend at the time.
 6       Right?
 7              A.    Yes, uh-huh.
 8              Q.    You weren't married to her at that
 9       time?
10              A.    No.  And she says --
11              Q.    Are you married to her now?
12              A.    Right.
13              Q.    When did you get married?
14              A.    I told you I'm very bad about this.
15              Q.    It's 2006 now.
16              A.    Yeah.  Okay.  I think it was 2004.
17              Q.    Okay.
18              A.    The thing is, all these things are
19       happening at the same time, too much, too much to
20       keep straight, too much to even have one emotion
21       about.
22                  So the one thing that may sound incon-
23       sistent to you, but it is consistent, is that before
24       that time she was selling in El Paso, and she had
25       sold what we consider two sets of phone book covers,
```

1      and basically it's advertising for the people.

2                    I almost feel like I have to tell you

3      how that works because --

4          Q.    Well, who buys the phone book covers?

5          A.    Okay.

6          Q.    How does that work?

7          A.    Okay.  I'm glad you asked me, because,

8      I mean, it sounds so weird just me telling you.

9                    What it is is our people that work

10     with us will contact some realtors in the area, dif-

11     ferent areas.  It could be any town.  You know, we

12     just couldn't possibly keep doing Cincinnati over and

13     over.  I'd love it, you know, to be Cincinnati.  You

14     know, there's a person I know that lives in, we'll

15     say, Madisonville, and I know exactly how to get

16     there.  But that won't sustain a business.  You have

17     to go to different areas.

18                    So this time it was El Paso.  The sets

19     were already sold.  I was making sure that I was as

20     slicked up on that --

21                    THE WITNESS:  And I'm going to throw

22               you for a loop.

23          A.    I was making sure I was as up on that

24     GPS as I could possibly be, and then I had to go see

25     like -- let's see, how many were there? -- 40, 40-

1    something people in El Paso area.  And --

2          Q.    Who actually buys the plastic tele-

3    phone book covers?

4          A.    Okay.  That's --

5          Q.    Who pays you for that?

6          A.    Okay.  I'm glad you asked me, because

7    that helps me straighten things out.

8                Okay.  So what we do is we have the

9    realtors and we give them free ads on the vinyl phone

10   book covers.  They're perfectly-fitting phone books

11   for an area like, we'll say, El Paso.  Or we'll say

12   Cincinnati.  Okay?  Perfectly fitting.

13         Q.    Matches the size of the phone book?

14         A.    Right.  Perfectly fitting, and they're

15   kind of like the things you have on your book at

16   school, but they've got a little plastic sleeve that

17   holds them on.

18               Now, those are free ads given away.

19   And then each cover had somewhere like 24, like we'll

20   say 22 to 24 ads that are sold so to -- well, say

21   you're a painter.  There will be an ad for -- you're

22   the only painter, and it's given out by the realtors.

23               And my job at that point, and what was

24   called for at that point -- even though there's more

25   different things that I had to do.  Like, you know,

```
 1    we have to do desktop publishing and everything else
 2    like that.  But what we had to do, I have to get in
 3    the door and I'd have to -- I'd, you know, say I'm
 4    delivering the vinyl phone book covers for, you know,
 5    whatever realtor, it would be like Coldwell Banker or
 6    something like that, and then they've already talked
 7    to a salesperson and they know that after that they
 8    are supposed to give me a check or pay my credit
 9    card, but I have to get to their door or I have to
10    get to where they are.
11                Sometimes, if you talk about painters
12    and that type of thing, they'll tell you, This is my
13    address.  And then you get close to the address and
14    the guy says, "Well, I'm at work.  You have to come
15    over to this address."  So I have to be really hot
16    with the GPS unit.
17         Q.    So people pay you to put ads --
18         A.    Yes.
19         Q.    -- on the plastic?
20         A.    Yes.
21         Q.    Is that the only source of revenue in
22    the business?  Do you give away for free the actual
23    telephone book cover?
24         A.    We give the realtors a large amount of
25    them, that give them to people who are buying and
```

```
 1    selling properties in the area and --
 2            Q.   But the money that your business gets
 3    is just from the sale of advertising --
 4            A.   Yes.
 5            Q.   -- on the plastic cover?
 6            A.   That's correct, uh-huh.
 7            Q.   And your wife would know what the
 8    sales have been for that business for the years in
 9    issue?
10            A.   Yes.  Well, she'd be able to find out,
11    you know.
12            Q.   Who possesses the records of this
13    business since you started it in 1992?  Do you have a
14    box of files at home?
15            A.   I would say my wife does, yes.
16            Q.   And maybe H and R Block?  When is the
17    last time you used H and R Block?
18            A.   I don't know.  I don't know.  It just
19    wasn't something -- my part of what we do, you know.
20    But I would say my wife and H and R Block, and this,
21    that and the other.
22            Q.   Was this business a corporation or a
23    sole proprietorship or a partnership?
24            A.   Now you're getting into the areas that
25    I'm not very good at.
```

1          Q.    You don't know if it was a corporation
2     or not?
3          A.    No, I don't.
4          Q.    Who started the business?
5          A.    My wife and I.
6          Q.    She was your girlfriend then --
7          A.    Yes.
8          Q.    -- when you started in 1992?
9          A.    Yes.
10         Q.    And you don't know what the form of
11    the business was?
12         A.    No.
13               The part that we have left out --
14               And there's not much more of it, so I
15    would like to cover that if that's all right with
16    you.
17         Q.    What part is that?
18         A.    -- is after the officer arrested me
19    and put me in the car --
20               If you read my report, then you know
21    that they just didn't take me to jail, as you would
22    think they did.  They took me around a building and
23    sat there, and while this was going on --
24         Q.    Who is "they" took you?  Who are you
25    talking about?

```
 1              A.   The police.
 2              Q.   But who?  The same ones you described
 3    before?
 4              A.   No, no.  I think they have a --
 5              Q.   The man and two women, the one or two
 6    women?
 7              A.   You know, I have to guess on this
 8    stuff, because all I can do is tell you what I
 9    experienced.
10              Q.   But it was not Police Officer Hart?
11              A.   No.
12              Q.   Okay.  But you can't tell me who it
13    was?
14              A.   You know, they were all working in
15    conjunction.  And it seemed not very well, either,
16    because they would take me over -- they took me
17    around this building, and I could hear everything
18    going on in the radio.  I could hear everything
19    that -- it sounded -- you know, I might be wrong, but
20    it sounded like there were ten or 12 different people
21    out there and all giving their impressions on what
22    was said.  At one point --
23                   I'm wearing this guy out.
24              Q.   He'll take a break when he needs to.
25              A.   Okay.
```

```
 1                At one point they were saying -- they
 2      were talking about me as if I was a news crew.  They
 3      said, "Did you get the news crew that was filming
 4      us," and they seemed very agitated that somebody was
 5      filming them.
 6                Let's see.  Then they said something
 7      about that I was in a van.  And they said, "He wanted
 8      to go across in a field."
 9                And I said to the driver, I said, "Who
10      are they talking about?"  And he said, "They're
11      talking about you."
12                And it was like all these people were
13      just saying all these things, and it was like they're
14      half guessing, half talking facts, and it was really
15      a mess.  And then at -- okay.  Then this other female
16      officer came up.  Now, I couldn't be sure if this was
17      Officer Hart or who she was, but -- I don't think it
18      was.
19                MR. GANULIN:  Stand up for him, if you
20           don't mind.
21                MS. HART:  (Complies with request.)
22           Q.   She's pretty short.
23           A.   Well, I couldn't tell, you know,
24      because I was sitting in a police cruiser and this
25      lady comes up and she says -- and I said, "Listen" --
```

```
 1            Q.   Well, look at it her.  Was it her or
 2     not her?
 3            A.   Seven years later and, you know, all
 4     this stuff's going on?  I mean, she'd have to tell
 5     me.  If she wasn't, I'd have to say -- I wouldn't
 6     know who it was, you know.
 7                 But I said, "Please just play back the
 8     tape."  I mean, the guy says he has a tape of what
 9     happened.  Please play it back.  And she said she
10     would.
11                 So we're sitting there behind this
12     building and I'm thinking, well, you know, they're
13     going to play this back and you're going to hear me
14     talking about a GPS unit and they're going to let me
15     go.  That didn't happen.  They took me to jail.
16                 Then -- let's see.  And if they played
17     that tape back and said let me, you know, just get
18     the hell out of here, then no harm, no foul.  Because
19     I didn't realize what I was in the middle of.
20                 I called -- okay.  I thought that they
21     would still listen to the tape.  They still didn't do
22     it.  I thought that they would -- I wrote to like the
23     prosecutor's office later after that and pleaded with
24     them to listen to the tape so that they could just do
25     away with this, because I really was not -- you know,
```

```
 1    I know some people who can get into trouble and just
 2    not even think about it, but it was hurting me.  It
 3    was wrecking me to be -- because there's nothing I
 4    can do.  I'm not used to being in the legal system
 5    and just sitting and waiting for what happens.  I
 6    need to make something happen.  I need to make things
 7    better.
 8                     And so all I could do was write down,
 9    write to people.  And there were a couple people that
10    told me that there were tapes of it, and I was pray-
11    ing that they would have that.  And then I -- and I
12    would tell myself, when they go to court, when they
13    bring the tapes out, they'll see that all that was
14    said was, you know, me talking about a GPS unit and
15    telling her that I was just driving around, you know.
16                     And then we had a subpoena for them,
17    for the tapes, because even just myself hearing that,
18    I know what I said, and just to have that in my hands
19    would have helped me, you know, just to have that in
20    my hands.  And they never came forward with it.
21                     And let's see.  There was another
22    little part I wanted to put here.  I was counting on
23    first the prosecutor hearing the tape and just throw-
24    ing it out.  I was counting on that, and it didn't
25    happen.
```

```
 1              Q.    Okay.
 2              A.    And it went on for months.  This all
 3    went on for months.  My girlfriend, I finally got her
 4    back after she said, "Well, it didn't sound like
 5    something you would do."  But just the same, any
 6    woman, she hears something like that, it's going to
 7    cause a reaction like that.
 8              Q.    Did I hear you say she took the kids?
 9              A.    Yes.
10              Q.    Kids that you and her have had
11    together?
12              A.    Uh-huh.
13              Q.    How old are the children?
14              A.    Well, the girl is 18 and the boy is
15    12.
16              Q.    Okay.  And then you have other chil-
17    dren, it sounds like.
18              A.    Uh-huh.
19              Q.    How many other children?
20              A.    I have a total of five.
21              Q.    Five total, the two who are 18 and
22    12 --
23              A.    Yes.
24              Q.    -- and then three older children?
25              A.    Yes.  There was a point I was trying
```

```
 1    to get to.  Okay.
 2               Q.    How many times have you been married?
 3               A.    Only once, this time.
 4               Q.    This is the first time you've been
 5    married?
 6               A.    Uh-huh, uh-huh.
 7               Q.    And I see you identify your wife as a
 8    witness.
 9               A.    Yes.
10               Q.    Can we arrange for her deposition for
11    next week?  Is she in town?
12               A.    Oh, wow.
13               Q.    Well, I'm going to have to depose each
14    one of the people you've identified here, Troy Tipton
15    and --
16               A.    Oh, jeez.  See, this is even -- it
17    bothers -- I mean, you've got to understand, there's
18    a certain amount of embarrassment about the whole
19    thing.  But, I mean, you've got to do what you've got
20    to do, so --
21               Q.    Well, but you're identifying them as
22    witnesses, so --
23               A.    They can verify.
24               Q.    -- I have to depose them, particularly
25    because you're claiming damages.  You said your wife
```

```
 1    is the one who would know what the damages are.

 2            A.    Yes.

 3            Q.    So I need to depose her.

 4            A.    Okay.

 5            Q.    So can we arrange for that next week?

 6            A.    You know, I -- I can't speak for her,

 7    because --

 8            Q.    Well, I mean, the Court can order it,

 9    but --

10            A.    Uh-huh.

11            Q.    And usually parties to a case arrange

12    these things.

13            A.    Well, I mean, there's no need to apol-

14    ogize for it.  I mean, if it has to be that way, it

15    has to be that way.

16            Q.    You know, can you check with her

17    and --

18            A.    Uh-huh.

19            Q.    -- just check on her availability on

20    for next week?

21            A.    Right.  I can do that.

22            Q.    Troy Tipton, you identified him.  Is

23    he still around, as far as you know?

24            A.    I haven't talked to him in a while.

25    You know, I don't know.
```

```
 1              Q.    Did you say that you don't even know
 2    what your income was for last year, did I ask you
 3    that, for 2005?
 4              A.    No, I don't.
 5              Q.    Okay.  2004 or 2003?
 6              A.    I don't know any of those.
 7              Q.    For any of the years from 1992 through
 8    to today, you don't know what your income was?
 9              A.    No.  I pretty much let my wife take
10    care of that.
11              Q.    How do you currently earn an income?
12              A.    Well, I work for other companies that
13    do the same thing that we did.
14              Q.    Who do you work for now?
15              A.    It's called DAS.  It's a lady's name,
16    the initials.  And I currently will be delivering
17    next week, you know, maybe even this week.  But --
18              Q.    DAS, you said?
19              A.    Uh-huh.
20              Q.    And who owns that business?
21              A.    Her name is Diana Dawson.
22              Q.    Is that in Cincinnati?
23              A.    She is actually in Butler, Kentucky,
24    but --
25              Q.    Do you know, what is the address of
```

```
 1    that business?
 2            A.    I don't know the address.  I can
 3    easily get it, though.
 4            Q.    How about the phone number?  Do you
 5    know the phone number of the business?
 6            A.    I don't know it offhand.  I have it in
 7    my cell phone, so I push a button and there it is.
 8    So I never dial it.
 9            Q.    And do you have any other source of
10    income currently besides that job?
11            A.    Well --
12            Q.    How long have you been working in that
13    job?
14            A.    I was working since about '92 but not
15    for the same people.  You know, I also had a band
16    that went to --
17            Q.    I'll get to the band in a second.
18            A.    Okay.
19            Q.    But for now, the business in Kentucky
20    that you're describing, you've been affiliated with
21    them in some capacity since '92?
22            A.    No.
23            Q.    That was my question.
24            A.    See, the thing is, the job that I'm
25    doing now, there are a lot of people that do the same
```

1    thing in Cincinnati, and there are -- my business

2    almost could be considered separate from it, because

3    they need someone that they can trust that knows how

4    to work their business, knows how to do this busi-

5    ness, how it works, and it wouldn't be unusual for me

6    to be in -- well, next week I'll probably be in

7    Florida, and for me -- someone to know that I'm there

8    and to say, well, we have a set that will be flying

9    in there.

10          Q.   Before I forget, would you prefer that

11   your wife be deposed this week?  I figured next week

12   would give her time to get the records together and

13   all that.  Would this week be better?

14          A.   This week would not be better.

15          Q.   Okay.

16          A.   I -- I just don't know.  You know,

17   she's such a busy person and she doesn't like to

18   drive downtown.  She doesn't like to park downtown.

19          Q.   Okay.

20          A.   She doesn't like to come downtown, you

21   know.

22          Q.   Okay.  Then if you'll check her sched-

23   ule, if we can arrange for next week, then --

24          A.   Okay.  I'll do that.

25          Q.   -- is that okay with you?

```
 1              A.    That's fine.
 2                    And another thing I should tell you
 3      about driving around downtown when you do the deliv-
 4      eries, the downtown is always the hardest.  It's
 5      always going to be the one that's going to give you a
 6      problem as far as how to get around.
 7                    See, anytime that you do what I do,
 8      you're liable to get a ticket, or there would be a
 9      one-way street that you don't know about or all of a
10      sudden, you know, like a tall building like that,
11      like what was going on there.  You know, being from
12      Cincinnati and you're in the middle of that -- that
13      set, El Paso, what do you do?  You know.
14              Q.    Did you earn income in 1999 from your
15      band?
16              A.    Yes.
17              Q.    Do you know about how much income you
18      earned?
19              A.    I wouldn't know, but I'll try my best
20      to get some records.
21              Q.    When did the band start?
22              A.    When I was about 16.
23              Q.    So 41 years ago?
24              A.    Yes.
25              Q.    And you had the band through the '60s
```

```
 1   and '70s?

 2            A.    Uh-huh.

 3            Q.    And '80s and '90s?

 4            A.    Right.

 5            Q.    And does your wife keep the band

 6   records, also?

 7            A.    Pretty much.

 8            Q.    Do you have any idea what the income

 9   from the band was?

10            A.    No, but we'll get -- I'll try my best

11   to make sure she has it.

12                 Now, you have to understand that both

13   of these businesses -- oh, well, I'm not very good at

14   that.  I'll try to have her get that together for

15   you.

16            Q.    How many gigs did the band have, say,

17   in 1999, roughly?

18            A.    We worked every week.

19            Q.    Every weekend or --

20            A.    Yes, every weekend.

21            Q.    Where?

22            A.    Anywhere and everywhere.  We were

23   voted the best of Cincinnati and --

24            Q.    What kind of music?  Jazz?

25            A.    No.  Dance music.  Anywhere and every-
```

```
1   where.
2               Q.    So did you play clubs --
3               A.    Yes.
4               Q.    -- or were these private parties?
5               A.    Mostly clubs, but some private
6   parties.  And the thing is that I found, you know,
7   the thing that really gave me a problem was when --
8   with all the stuff being on the Internet and stuff
9   like that, I had a real problem going somewhere where
10  I thought somebody was going to say, "Hey, heard you
11  were arrested the other day," you know what I mean,
12  when there's a big room full of people, you know.
13  That's one of my nightmares.  Wouldn't it be one of
14  yours?
15              Q.    But what clubs did you play?
16              A.    Well, Jillian's.  Let's see.  A lot of
17  places in Kentucky, a lot of places in Cincinnati.
18              Q.    Like let's just say in the 1990s did
19  you have a steady --
20              A.    Yes.
21              Q.    What clubs did you work at every week?
22              A.    Let's see.  Jeez.  I'm having trouble
23  with the names now.  Let me just knock on the one
24  here.  Let's see.
25                    The problem is, they've changed names
```

```
 1    so much.  Rick's Tavern.  Let's see here.
 2              Q.   Where is that?
 3              A.   In Fairfield.
 4              Q.   Fairfield.  So you had a steady
 5    engagement there at Rick's Tavern in Fairfield?
 6              A.   No.  We actually -- we like to move
 7    around a lot, like every weekend a different place.
 8              Q.   What other clubs besides Rick's
 9    Tavern?
10              A.   I'd have to look the names of them up.
11    And, actually, Troy could probably help you more with
12    that than I could.
13              Q.   Did the band tend to peak like in the
14    1980s, for instance?  Was there more dancing back
15    then?
16              A.   No.  I'll tell you this.  After 9/11
17    things got a little weird.
18              Q.   With dancing, you mean?  What?
19              A.   No.  More with people wanting to stay
20    close to their families and things like that, you
21    know.
22              Q.   So the demand for the dance band kind
23    of --
24              A.   No.  You know, that never really -- it
25    may have went a little bit down, but not really.
```

```
 1              What was I trying to say here, now?
 2   I've got a thought here that I wanted to make.
 3              I was blessed with the ability to play
 4   any type of music that I want.  Okay?  And what it
 5   basically did was music kind of changed a little bit.
 6   And I could have worked every night I wanted, you
 7   know, if I would just do like blues or something like
 8   that, you know.
 9        Q.    What do you play, what instrument?
10        A.    I play guitar, and I sing, and I play
11   harmonica and a bunch of stuff, you know.
12        Q.    You're still doing that today?
13        A.    I still do it at home and I still have
14   places that want me to play there.  But like I say,
15   it all is -- it's a thing that builds on itself, and
16   you break that, you break that.  What happens is you
17   try to get the best musicians you can get, and you've
18   got to keep them working.  You stop them from work-
19   ing, you lose those musicians.  You lose the musi-
20   cians, then you lose the jobs.  You lose the jobs,
21   you lose -- you can't get the musicians.
22              Now, I actually could do that, and I
23   intend to do that again, but it was -- I couldn't be
24   sure that I wouldn't have that situation where people
25   would be talking about, "Oh, you hear about Gradual?
```

1    He's" -- you know.  And I don't know whether that

2    happened or not.  I don't think it did.  But it's

3    hard to do what you do, what I do, and have the

4    thought that something like that is going to happen.

5              Q.    Did you see any doctors as a result of

6    what occurred that's the subject of the lawsuit?

7              A.    No, I don't think so.

8              Q.    Did you have any counseling as a

9    result of the subject of the lawsuit?

10              A.    No.  I just -- let's see.

11              No.  It just -- it was just very hard

12    on me, and it didn't have to have been that way.  It

13    could have -- and a lot of that doesn't even have to

14    do with Officer Hart.  As soon as they knew that they

15    had nothing, they should have just dropped it.  But

16    they went -- they kept going forward with it.

17              Q.    You're talking about the prosecutors?

18              A.    Yes.  And, really, I have to say I

19    really wish that Officer Hart did not file that

20    Complaint, because if you look at it, I mean, it's

21    not very good.  Is it?

22              Q.    Well, when --

23              A.    It's not very good; it's not very

24    good.

25              Q.    What do you mean when you say it's not

```
 1    very good, the Complaint?  What do you mean,
 2    because --
 3              A.   When you look at, what do you see?
 4              Q.   Pretty much what you've described it.
 5              A.   It's not very good, is it?  That's not
 6    what you want to see when you want somebody arrested.
 7    That's not what I want to see.  I want to see some-
 8    thing like:  he actually did this.
 9              Q.   The "did this" meaning asked -- well,
10    the words you said a john would use.  Is that what
11    you're referring to?
12              A.   Well, if you've got somebody who did
13    say something like that or did do something like
14    that --
15              Let me -- can I see that?  Can I see
16    the report?
17              Q.   Sure (handing document).
18              A.   You know, you say -- show me where the
19    crime is on that report.
20              Q.   So it's your --
21              A.   Show me where the crime is, please.
22              Q.   So it's your opinion that this Com-
23    plaint has to prove that a crime actually occurred.
24    Is that what you're saying?
25              A.   No.  I'm just -- what am I actually
```

```
1    being accused of there?
2            Q.    Of loitering to engage in solicita-
3    tion.
4            A.    That's a good answer from an attorney.
5    But really --
6            Q.    No.  I was reading what's on top of
7    the Complaint.
8            A.    Okay, okay.  But when you look at
9    it -- I mean, believe me, you know, we've all done
10   things, if we had to do it over again -- I would bet
11   that if Officer Hart saw that, she wouldn't do that
12   one again.
13           Q.    Well, my question for you is, I think
14   you've said that you drove in the vicinity of Officer
15   Hart, you stopped, you had some conversation.
16           A.    You know, it wasn't just Officer --
17           Q.    I have to finish my question so he can
18   get me down.
19           A.    Okay.
20           Q.    And then you'll have a chance to
21   answer.
22           A.    Uh-huh.
23           Q.    You were there within sight of her?
24           A.    Uh-huh, that's correct.
25           Q.    You drove the car in the vicinity of
```

```
 1    where she was a few times?
 2              A.   That's correct.
 3              Q.   You and she actually spoke a couple
 4    times at least, you said.  So those facts are
 5    correct.  Right?
 6              A.   I drove and I saw her and --
 7              Q.   That you stopped near enough that you
 8    could see her?
 9              A.   Uh-huh.
10              Q.   That you drove the vehicle in the
11    vicinity of where she was doing the sting?
12              A.   That's correct.
13              Q.   And that you and she actually had a
14    couple of conversations.
15              A.   I wouldn't call them conversations,
16    but, yeah, okay.
17              Q.   You spoke to each other.
18              A.   Uh-huh.
19              MR. GANULIN:  Why don't we take a
20              little break for you.  If you need the
21              restroom, there's one down the hall there.
22              We need to talk, and they may want to use
23              the restroom.  You know, just five minutes.
24              Okay?
25              THE WITNESS:  Oh, you need to talk,
```

```
1              you mean?
2                    MR. GANULIN:  Yeah.  We'll take a
3        break.
4                    THE WITNESS:  Okay.
5                    MR. GANULIN:  They're going to come
6        down to my office.  If you want to use the
7        restroom, you go out in the hall and down
8        around that way.
9                    THE WITNESS:  Okay.
10                   MR. GANULIN:  And we'll come back in
11       five minutes.  You may want to take a
12       break.
13                   THE WITNESS:  Okay.
14                   (Recess taken:  3:39 PM - 3:53 PM.)
15                   MR. GANULIN:  We should go back on the
16       record here.
17                   Mr. Taylor, Ms. Rutowski has a few
18       questions for you.
19                   THE WITNESS:  Okay.
20                   MS. RUTOWSKI:  We're going to be real
21       brief, because Mr. Ganulin has covered
22       pretty much everything that I had wanted to
23       ask as well.
24                   THE WITNESS:  Good.
25                          - - -
```

```
 1    BY MS. RUTOWSKI:
 2             Q.    I want to go back to when you were
 3    actually talking with Officer Hart.
 4             A.    Uh-huh.
 5             Q.    What was she saying to you?  You said
 6    some of this and some of that.  Can you give us a
 7    little bit more detail?
 8             A.    You know, a lot of it's not even clear
 9    now after this time.  I can't exactly remember.  But
10    it was about what you'd expect someone to say that
11    was doing what she was doing.
12             Q.    Okay.  I don't need for you to tell me
13    exactly what she was saying, but if you can, you
14    know, generally give us an idea of what she was
15    saying.
16             A.    I thought I did, but I'll do my best.
17                   Okay.  She basically was presenting me
18    the opportunity to tell her what I wanted her to do.
19             Q.    Was she making specific offers for
20    different sex acts --
21             A.    I can't remember.
22             Q.    -- or what did she say?
23             A.    I can't remember exactly.  I don't
24    think it was very -- I don't think it was very spe-
25    cific at all, and it wasn't -- it was very brief.  It
```

```
 1     was very brief.  You know, it was -- because I -- if
 2     she thinks back, I honestly did say:  I'm just driv-
 3     ing around.  Well, one thing she said after that was,
 4     "Oh, I don't have time for that."  I think she'll
 5     agree with that.
 6               Q.    But was she specifically offering sex?
 7               A.    I -- I don't think those words were
 8     said.  It wasn't those words or anything.  Something
 9     close to it, but, you know, that's it.
10               Q.    And you had mentioned that you thought
11     that she was trying to get you into trouble.  At what
12     point did that come into your mind?
13               A.    Because she walked so far from where
14     she was to where I was the second time.
15               Q.    And then you said that as you were
16     getting arrested there was a tall police officer, a
17     tall male police officer.
18               A.    Uh-huh.
19               Q.    Do you remember if he was black or
20     white?
21               A.    He was white.
22               Q.    He was a white officer?
23               A.    Uh-huh.
24               Q.    Okay.  Do you --
25               A.    No.  He was blond, I think.
```

1          Q.   Okay.  And was he the one that

2   actually arrested you, then?

3          A.   Yes.

4          Q.   Okay.

5          A.   And he had shorts on, I believe.

6          Q.   And then you said you were put into a

7   car with someone else.  Did you speak to that other

8   individual at all?

9          A.   Yes.

10         Q.   And what was he in the car for, do you

11   remember?

12         A.   He was in there for -- he said, he

13   said "I did it," you know.

14         Q.   Okay.

15         A.   And, you know, actually he told me who

16   he was.  And he was very young and --

17         Q.   Do you happen to remember his name?

18         A.   I don't remember his name.

19         Q.   Okay.

20         A.   I used to know the officer that drove

21   the pickup, the car.

22              That's another thing I didn't make

23   clear.  They had what I can only assume was a unit

24   that their sole job was -- they weren't really

25   connected to them other than they'd come around and

```
 1    pick up the people that they arrested, and he'd sit
 2    there and wait until they did that.  And that guy's
 3    name was Officer Matt Martin, I think it was, or
 4    something like that.
 5          Q.   Okay.  So initially you're put into
 6    just a regular police cruiser?
 7          A.   Yes.
 8          Q.   And that's when you get driven around
 9    the building --
10          A.   Yes.
11          Q.   -- and you're sitting there?
12          A.   Uh-huh.
13          Q.   And then are you saying then another
14    vehicle came up and picked you up and took you to
15    jail?
16          A.   No.
17          Q.   No?
18          A.   When I got arrested there was a car
19    behind me, and in the car was a man and a woman, and
20    I know they were kind of back here going like this
21    (demonstrating), you know.  I mean, I'm sorry, it's
22    kind of comical to think about it, but they were.
23    And I just didn't care, because I was doing what I
24    was doing, you know.
25               And that's the thing that I think is
```

```
 1    not being brought out here today.  And from what
 2    Richard said, yes, the officer probably was doing her
 3    job, but there were other people on the street doing
 4    their jobs, doing all kinds of other things.
 5                 And I'm not saying the streets were
 6    crowded.  I'm just saying there were people doing
 7    other things, and I didn't think any of those were
 8    connected to me, you know.
 9         Q.   Okay.
10         A.   I just wanted to get on my little --
11    like I say, whenever I get inside a city, I'm halfway
12    afraid of being arrested.  Or I won't say arrested.
13    I'm halfway afraid of getting a ticket, is the number
14    one thing for me, for being parked wrong or something
15    like that.  And so I knew I was parked right, and I
16    was right in front of a church and in a parking
17    thing, and I should have been able to do what I
18    wanted to do there.
19         Q.   Okay.  So you're driven around back?
20         A.   Uh-huh.
21         Q.   You're there for some period of time?
22         A.   Right.
23         Q.   And that's the car that takes you down
24    to the jail?
25         A.   Yes.
```

```
 1              Q.    Okay.  What happens when you get to
 2       the jail?  Are you booked in?
 3              A.    Just -- just taken just as you would
 4       think, you know.  Just --
 5              Q.    Okay.  How long were you in jail?
 6              A.    I don't know.  I think it was maybe
 7       four or five hours, something like that.  That wasn't
 8       really the bad part.  The bad part was the part
 9       between being arrested and getting it resolved.
10       That's what was killing me.
11              Q.    Okay.  And why was it taking so long?
12              A.    Why was what taking so long?
13              Q.    Getting it resolved.  Did you make any
14       requests to delay or waive time on the trial --
15              A.    No.
16              Q.    -- do you remember?
17              A.    No.
18              Q.    And when you got to trial, what hap-
19       pened at the trial, do you remember?
20              A.    I had a public defender, and he was
21       terrible.
22              Q.    Did Officer Hart testify?
23              A.    She left, as I recall.
24              Q.    But she was there?
25              A.    I believe she was, because the attor-
```

1    ney said to the judge, "Officer Hart and some of her

2    people have another meeting that they have to go to,"

3    I believe.

4         Q.    Did anyone --

5         A.    To the best of my memory.

6               Please?

7         Q.    So Officer Hart did not testify?

8         A.    No.

9         Q.    Did anyone testify, did any police

10   officer come in --

11        A.    No.

12        Q.    -- and testify against you?

13        A.    No.

14        Q.    So what happened to your case?

15        A.    It was dismissed.

16        Q.    It was dismissed, but after no

17   officers testified?

18        A.    Right.

19        Q.    All right.  I just have a couple more.

20   In your Complaint that you wrote you stated that your

21   business partner left you.

22        A.    Yes, that's right.

23        Q.    What was his name?

24        A.    I'm sorry.  That was my -- her name

25   was Sheila Dixon.

```
 1              Q.    Your now wife?
 2              A.    Yes.  That's why it was so funny when
 3     you said what was his name.  I'm sorry.
 4              Q.    That's all right.  So "this resulted
 5     in my wife and business partner."  So one and the
 6     same person?
 7              A.    Right.
 8              Q.    Okay.
 9              A.    Now wife.  She wasn't then.
10              Q.    Okay.  And then your car.  You said
11     you were in jail for four or five hours or so?
12              A.    Yes.
13              Q.    Was your car impounded?
14              A.    No.
15              Q.    Okay.
16              A.    That's just a curiosity.  I mean, when
17     I think back about it, I don't remember -- I think
18     they may have thrown the keys on the floorboard or
19     something like that.  But, you know, the whole time
20     I'm thinking:  Now, wait a minute.  How can my -- if
21     they arrested me and I don't have my keys, and I'm
22     going, you know, I'm heading back to my car, because
23     that's all I could do --
24                    And the girl, the female officer
25     that -- one of the ones that arrested me, she had the
```

```
 1    GPS in her hand and she says, "I'm taking this and
 2    I'm putting it in the trunk.  Okay?"  Which I'm glad
 3    she did, you know.
 4              But it was just all kind of odd.  I
 5    mean, maybe it makes perfect sense to you.  To me
 6    it's, whoa, to think about your car being open in the
 7    downtown.
 8              Q.   And you said in your Complaint, also,
 9    that they separated you from your cell phone.
10              A.   Yes.
11              Q.   When did you get your cell phone back?
12              A.   I don't know.
13              Q.   Would it have been right there at the
14    jail when you were released?
15              A.   I don't know.  The thing is, it wasn't
16    so much that I was separated from my cell phone.
17    It's that my -- the doctors could have called and
18    said your mother needed a transfusion right now.
19              MS. RUTOWSKI:  I don't think I have
20              anything else.
21              MR. GANULIN:  That's it.
22              A.   And the thing is, that didn't happen,
23    but if it was your mother, you'd be thinking it was
24    happening, wouldn't you?  You know, I'm separated
25    from my cell phone and they're calling and they can't
```

```
 1   get ahold of me.  That's what I was thinking.
 2                   But, I mean, that whole period I could
 3   have forgiven it all if I could have just got ahold
 4   of the prosecutor and he reviewed what he had and
 5   said:  I don't have anything.  But maybe it doesn't
 6   work that way.
 7                   MR. GANULIN:  Will you let us know
 8             about your wife's availability for next
 9             week?
10                   THE WITNESS:  Well, I might let you
11             guys handle that with her.
12                   MR. GANULIN:  Do you want us to like
13             subpoena her, then?
14                   THE WITNESS:  Oh, jeez.  That wouldn't
15             be good.
16                   MR. GANULIN:  I mean, we'll send out a
17             subpoena tomorrow if you want us to.
18                   THE WITNESS:  No.  Let's see.
19                   MR. GANULIN:  I mean, again, usually
20             parties to a case work things out if they
21             can.  That's what we're supposed to try to
22             do.  If we can't, we have the right to
23             subpoena her to be deposed.
24                   THE WITNESS:  Oh, okay.  Let her --
25                   MR. GANULIN:  And I don't want to
```

1          subpoena her if you're going to, you know,

2          arrange for her to be available.

3              THE WITNESS:  I want to do that, but,

4          see, I don't know her schedule.

5              MR. GANULIN:  That's fine.  That's why

6          I'm just asking.  You can call me.  Do you

7          have my number still, or do you want it

8          again?

9              THE WITNESS:  Yeah, I could use that.

10          MR. GANULIN:  Okay.  I'll give you my

11        number again.

12          Do you still have that pad?

13          MS. HART:  No.  I left it in your

14        office.

15          MR. GANULIN:  Call and leave it on my

16        voice message system if I'm not here.

17          THE REPORTER:  Do you want to cover

18        signature as a part of the record, ask him

19        about reading and signing?

20          MR. GANULIN:  Ask him, yes.

21          THE REPORTER:  I can't talk and take

22        at the same time.  I'm sorry.  That's why

23        I'm asking you.

24          MR. GANULIN:  Okay.

25          You have the right to review the tran-

```
 1              scription and then we need you to sign it
 2              after it's been transcribed.  If not, it
 3              will get filed with the Court without your
 4              having --
 5                   THE WITNESS:  Okay.
 6                   MR. GANULIN:  Okay.
 7                   There's our two telephone numbers
 8              (handing).
 9                   THE WITNESS:  Okay.
10                   MR. GANULIN:  And then we're going to
11              need your wife to bring the records from
12              the business --
13                   THE WITNESS:  Okay.
14                   MR. GANULIN:  -- concerning income.
15                   THE WITNESS:  But I really don't want
16              you piling a lot of work on her, because
17              she's overworked as it is.
18                   MR. GANULIN:  Again, the issue is that
19              you claim damages.
20                   THE WITNESS:  Yes, right.
21                   MR. GANULIN:  And you aren't able to
22              tell us --
23                   THE WITNESS:  Right.
24                   MR. GANULIN:  -- the income stream
25              from the business, either --
```

```
 1              THE WITNESS:  Okay.
 2              MR. GANULIN:  -- the telephone cover
 3         business or your band, year by year.
 4              THE WITNESS:  Okay.
 5              MR. GANULIN:  And we'll get tax
 6         returns, whatever she has.
 7              THE WITNESS:  Okay.
 8              MR. GANULIN:  Is there anybody else
 9         you want us to get information from con-
10         cerning your financial --
11              THE WITNESS:  You know, my finan-
12         cial --
13              MR. GANULIN:  I need to finish, for
14         his sake.
15              THE WITNESS:  Yeah.  Okay.
16              MR. GANULIN:  -- concerning your
17         financial records besides your wife?
18              THE WITNESS:  No, that's probably
19         pretty much it.
20              I'd just like to say that I find, you
21         know, all this pretty embarrassing and, you
22         know, I'd like it to end any way that it
23         can, but -- that's pretty much it.
24              MR. GANULIN:  Okay.  Thank you.
25              THE WITNESS:  Well, let me just one
```

1          more thing.

2                MR. GANULIN:  Do you want it on the

3          record or off the record?

4                THE WITNESS:  On the record.

5                You know, in saying that it is pretty

6          embarrassing, it is pretty much torture

7          still going on, and I'd like it to end as

8          soon as possible.

9                MR. GANULIN:  Okay.

10               THE WITNESS:  I'll bet you feel

11        tortured, too.

12              MR. GANULIN:  Are you done?

13              THE WITNESS:  Well, maybe you don't.

14              MR. GANULIN:  Are you done?

15              THE WITNESS:  Yes.

16              MR. GANULIN:  Okay.

17          We can go off the record.

18

19                        _____

                        Gradual Taylor

20                    - - -

21

22        (Deposition concluded at 4:10 PM.)

23                    - - -

24

25

```
 1                C E R T I F I C A T E

 2     STATE   OF   OHIO  :
                           SS:
 3     COUNTY OF HAMILTON  :

 4          I, Luke  T.  Lavin, a duly qualified and  commis-

 5     sioned  notary  public in and for the  State  of  Ohio,

 6     do  hereby certify that prior to the  giving  of  his

 7     deposition, the within named Gradual Taylor was  by  me

 8     first duly sworn to testify the truth; that  the  fore-

 9     going  pages constitute a true and  correct  transcript

10     of  testimony given  at said time  and place  by  said

11     deponent; that  said deposition  was taken  by me   in

12     stenotypy  and transcribed under my  supervision;  that

13     I  am neither a relative  of nor attorney for  any  of

14     the parties  to this  litigation, nor relative  of  nor

15     employee  of any of their counsel, and have  no  inter-

16     est whatsoever in  the result of  this litigation.   I

17     further  certify that  I am  not, nor  is  the   court

18     reporting  firm with which I  am affiliated, under   a

19     contract as defined in Civil Rule 28 (D).

20          IN WITNESS WHEREOF, I  hereunto set  my  hand  and

21     official seal of  office, at  Cincinnati,  Ohio,  this

22     30th day of November, 2006.

23

24                              _____

25     MY COMMISSION EXPIRES:   LUKE T. LAVIN, RDR-CRR
       APRIL 26, 2010.          NOTARY PUBLIC, STATE OF OHIO
```